## People of the State of Illinois v. Louis H. Jacobs.

1. FALSE PRETENSES—*Must be of Existing Facts.*—A false representation, within the meaning of the criminal code, must be of a present, material, existing fact, which the party making it knows, or has good reason to know, is false.

2. SAME—*Promises are Not.*—A promise is not a pretense.

**Indictment,** for false pretenses. Error to the Criminal Court of Cook County; the Hon. JOHN BARTON PAYNE, Judge, presiding. Heard in this court at the October term, 1897. Reversed. Opinion filed December 16, 1897.

BLUM & BLUM, attorneys for plaintiff in error.

Where false representations are relied upon, it is essential that they relate to some material existing fact or facts, and not to the future intention of the defendant, which he may or may not perform. In respect of the allegation of a promise to pay without any intention to perform, it is said in Kerr on Fraud and Mistake, 88: "As distinguished from the false representation of a fact, the false representation as to a matter of intention (though it may have influenced a transaction), is not a fraud in law." In Gage v. Lewis, 68 Ill. 604, after quoting the above from Kerr with approval, this court said: "It can not be said that these representations and promises were false when made, for until the proper time arrived and the plaintiff refused to comply with them, it could not positively be shown that they would not

be performed.   Even if at the time they were made, it was not intended to comply with them, it was but an unexecuted intention which has never been held of itself to constitute fraud."   People v. Healy, 128 Ill. 13; Bishop on Criminal Law, Vol. 2, Sec. 420 ( 7th Ed.).

CHARLES S. DENEEN, state's attorney, for defendant in error.

It may rarely occur, that the falsehoods alone which are uttered are the sole influences which produce the effect. They may, and most generally are, ingeniously combined with truths.   Nay, expressions of countenance, a smiling face, an appearance of frankness and of truth, may often prove decisive, while the false pretenses uttered or expressed, would have proved unavailing.   Cowen v. The People, 14 Ill. 351.

MR. PRESIDING JUSTICE ADAMS DELIVERED THE OPINION OF THE COURT.

The plaintiff in error, Louis H. Jacobs, was convicted on an indictment charging that he, Louis H. Jacobs, on June 10, 1893, in said county of Cook, did, with Nathan Neufeld and divers persons, whose names are to the jurors unknown, feloniously and deceitfully conspire together with the fradulent and malicious intent, then and there feloniously, unlawfully, wrongfully and wickedly to obtain a large amount of personal goods, funds, money and property, to wit, one hundred current United States treasury notes of the denomination of one hundred dollars, of the value of one hundred dollars each, etc.   The indictment then proceeds to mention about all the different kinds of paper money and coin known to the law, and concludes as follows : " The personal goods, funds, money and property of one Dora Marks, from the said Dora Marks by false pretenses, and to cheat and defraud the said Dora Marks of the same," etc.

May 29, 1893, a certain agreement in writing was made between Frank H. Van Cleave, of Escanaba, Michigan, party of the first part, and Nathan Neufeld, of Chicago, Illinois,

party of the second part, in and by which the said first party agreed that he would execute and cause to be executed a good and sufficient conveyance of certain premises situated in Escanaba known as the Cochrane Roller Mills plant and location, consisting of buildings and grounds theretofore used by the Cochrane Roller Mills Company, containing five and one-hundredth acres, and being more particularly described in the agreement; that the deed of conveyance should run to John Corcoran, as trustee, for the use and benefit of said second party, the condition of the trust being that said second party should comply with his part of the agreement; on which compliance, title to said property should vest in said second party. Said first party further agreed to pay a sum not exceeding $2,000 for improvements to be made on the property suitable for a factory and operation thereinafter mentioned, to be paid from time to time as the work on the improvements progressed. Nathan Neufeld, the said second party, agreed on his part, to establish on the premises a factory for the manufacture of furniture and other manufactures, to employ not less than sixty hands for a term not less than five years or not less than one hundred for a term not less than three years, at the option of said second party, and to give such hands average wages for like work, etc., and that he would commence operations in the factory with not less than thirty hands on or before August 1, 1893; also that he would cause the buildings to be insured, the policies to be made payable to the first party; that in case of destruction of the buildings by fire, he would rebuild and resume business with all reasonable dispatch; that on delivery of the agreement, the said second party would execute a bond with two satisfactory sureties, to the first party, in the penal sum of $1,000, conditioned for the performance by said second party of his part of the agreement, said bond to be of effect for only three months after commencement of operations in the factory. Differences of opinion as to the interpretation of the agreement to be settled by arbitration.

This contract was subsequently assigned by Neufeld to the Chicago Furniture and Lumber Company hereinafter mentioned.

Prior to the execution of the above contract, and before the prosecuting witness, Dora Marks, appeared on the scene, it appears, from the evidence, that a similar contract had been made by Nathan Neufeld with the city of Escanaba, but an attorney having advised that the city could not directly make such a contract, the above contract was made, the city of Escanaba being the real party to the contract and Van Cleave a merely nominal party. The object of the contract on the part of the city was to obtain the benefit which might result from having such a factory as is described in the agreement established in the city.

The evidence shows that Neufeld had, for a number of years, been largely engaged in the business of manufacturing furniture in the city of Chicago, that Jacobs had been employed for years as a traveling salesman for the Judkins Company, which company was engaged in the business of manufacturing furniture in Chicago, and was so engaged while the negotiations were progressing in reference to the Escanaba enterprise, and was in the enjoyment of a salary of $2,000 per annum and one-fifth of the net profits of the company, the company paying his traveling expenses.

About May 20, 1893, Dora Marks, the prosecuting witness, came to Chicago to visit the World's Fair, when she met Jacobs, with whom she had been acquainted for twenty-eight or thirty years. Prior to this time, Jacobs, who, with his wife, boarded at Neufeld's house, had been informed of the contemplated establishment of a factory at Escanaba, had met some parties who had come from Escanaba to Chicago to negotiate with Neufeld, and Neufeld, for whom Jacobs had worked prior to the year 1889, had offered him inducements to take part in the Escanaba enterprise, as he, Neufeld, wanted Jacobs' services in the business. Such being the status of affairs, Jacobs, about between May 22 and May 25, 1890, told Mrs. Marks of the Escanaba enterprise, and asked her how her husband had left her, and learned from her that he had left her a piece of property in Denver, Colorado, incumbered for $15,000, and a legacy of $10,000, and that she had with

her a certificate of deposit for $7,000, which she showed
him. About May 24, 1893, Jacobs went to Escanaba with
Neufeld, examined the plant, and returned to Chicago very
enthusiastic in regard to the proposed enterprise. Jacobs
testified : "I went up with him, saw the place and was
very much enthused over it. It looked like a great oppor-
tunity to become possessor of a very valuable piece of
property. I was shown around the place by the men there
—business men, city officials, who took us out and showed
us what the probable cost of lumber would be; that we
could obtain very good manufacturing goods, and the quan-
tities that could be obtained, and the shipping facilities,"
etc. When Jacobs returned to Chicago from Escanaba, he
informed his wife and Mrs. Marks that the plant was the
finest he had ever seen for a city to offer, and that he was
going to withdraw from the Judkins Company, of which
he was then vice-president, and go into the Escanaba enter-
prise, and advised Mrs. Marks also to go into it, which she
at that time declined, on the ground that the $7,000 certifi-
cate was all she then had, and she wished to reserve it to
meet the mortgage on her Denver property, and nothing
more was said on the subject at that time.

June 6, 1893, Mrs. Marks, at the solicitation of Jacobs, as
she testified, went to Escanaba with Jacobs and Neufeld
and their wives. Mrs. Marks testified that while there
"they showed me the plant and took me all over—showed
me the plant and the boarding houses, lovely barn, and
everything on the place. 'Well,' I said, 'no use talking,
this is a fine place, but it will take lots of money to run this
place.' Mr. Jacobs said to Mr. Neufeld, 'Well, we have got
all the money we want to run this.' Then we went to see
Mr. Van Cleave." The next morning, June 8, 1893, Mrs.
Marks testifies, Jacobs invited her and Mrs. Jacobs to take
a walk, and she, Neufeld and Jacobs and their wives, went
to the office of a Mr. Gallup, a lawyer, she, Mrs. Marks, not
knowing where they were going, where she says the follow-
ing occurred: "We sat down at the door and Jacobs and
Neufeld near Gallup's desk, and Gallup sat down at the

desk and said, ' Well, Mr, Jacobs, how much money are you going to put into this ?' Mr. Jacobs said, ' $12,500.' Mr. Gallup says, ' Cash?' and he says, ' Yes. cash.' He turned to Mr. Neufeld and said, ' Mr. Neufeld, how much are you going to put into this ?' He says, ' $25,000.' He says, ' Cash?' He says, ' Yes, cash.' He turned to me and said, ' How much are you going to put into this, Mrs. Marks?' Well, I was rather surprised, and before I spoke, Mr. Jacobs spoke for me. He said: ' Mrs. Marks will put in $5,000.' Mr. Gallup turned to me and said, ' Are you going to put in $5,000 ?' I said ' I had't thought much about it,' so then we all left the office together." On cross-examination, Mrs. Marks testified that she didn't think they were in Gallup's office more than five minutes. Her statement as to what occurred in the office and the time occupied there, is contradicted both by Jacobs and Gallup. Jacobs testifies that he and Neufeld had seen Gallup on the afternoon of June 7, 1893, and were advised by him what was necessary to be done to incorporate under the laws of Michigan; that they informed Marks of this; that she knew where she was going on the morning of June 8th, and what was expected of her; that they remained in Gallup's office two or three hours, Mrs. Marks being present all the time; that Gallup went over the whole ground again, explaining what was necessary to be done in order to incorporate, stated what the capital stock was to be; stated the amount which each was to subscribe for, asked if that was right, and was informed that it was, and, no one making any objection, drew up the following contract, which they all signed :

"LAW OFFICE OF GEORGE GALLUP,

ESCANABA, Mich., June 8, 1893.

ARTICLES OF AGREEMENT, made and entered into this 8th day of June, A. D. 1893, by and between Nathan Neufeld, Louis H. Jacobs and Dora Marks, all of the city of Chicago, Ill.

WHEREAS, said N. Neufeld has a certain contract with one F. H. Van Cleave, of the city of Escanaba, Michigan, and whereas the above named parties, Neufeld, Jacobs and

Marks, propose to form a corporation of $200,000 capital stock, to be known as the Chicago Furniture & Lumber Co.

And therefore it is hereby agreed by and between said parties, for a valid consideration, each with the other, that they will subscribe for stock as follows :

Nathan Neufeld................$182,500
Louis H. Jacobs.....·...........   12,500
Dora Marks...................    5,000

It is further agreed by and between said parties, that said N. Neufeld shall assign to said L. H. Jacobs $37,500 of his stock, and to Dora Marks $15,000, and that he will hold $30,000 for the use and benefit of said corporation.

In witness whereof the parties have hereunto set their hands the day and date first above written.

NATHAN NEUFELD,
LOUIS H. JACOBS,
DORA MARKS."

Jacobs further testifies that Mrs. Marks told Gallup she was willing to invest $5,000, but did not want to go into it if she would be liable beyond that amount, and he informed her that she would not. Also, that there was no such talk as testified to by Mrs. Marks, that the word "cash" was not used. Gallup testifies that Neufeld, Jacobs and their wives and Mrs. Marks, came to his office between 10 and 11 A. M., and remained there from one and a half to two hours; that they talked about the incorporation, but as he had no blanks then, it was concluded not to prepare articles of incorporation at that time; that Mrs. Marks asked him if she would be liable beyond the amount of stock she subscribed for, and he advised her that, in his judgment, she would not; that he drew up the agreement heretofore mentioned, and they signed and left it with him, with the understanding that he should keep it for all of them, but that any of them could have a copy of it on request, and that he kept it in his possession until about a week before he testified on the trial, when he gave it to Mr. Blum, the attorney for plaintiff in error. Gallup also testifies that when the parties were at his office he made an appointment

People v. Jacobs.

to meet them in Chicago, after he had drafted the articles of incorporation, which he did June 12, 1893.   The witness further testified that the amount which each was to subscribe for was mentioned at his office, but he could not recollect any conversation in respect to whether the subscriptions were to be "cash."

Mrs. Marks testified that she did not sign the contract of date June 8th at the time of its date, but in the following August, but her evidence in that regard is of little or no value, because she says she did not read it.   If she signed it without reading, it is difficult to understand how she could identify it as a paper signed by her in August.

The trial occurred in February, 1897, and Gallup testified positively that the contract had been in his possession from the time it was signed in his office June 8, 1893, until about a week before the day on which he testified, which being true, Mrs. Marks could not have signed it in August, 1893.   Jacobs also swears that it was signed on the day of its date; and the presumption would be, in the absence of evidence to the contrary, that it was signed on that day.   We are of opinion that there is a decided preponderance of evidence that the contract of date June 8, 1893, was signed on the day of its date.   That contract is evidence that on the day of its date, Mrs. Marks agreed to join Neufeld and Jacobs in the formation of a corporation, and to receive stock in proportion to her subscription.   The evidence shows that subsequently, on June 12th, Gallup brought to Chicago the articles of incorporation, and that Neufeld, Jacobs and Mrs. Marks signed the articles.

The only alleged false pretenses claimed to have been made prior to the signing of the contract of June 8, 1893, were the statements claimed by Mrs. Marks to have been made by Neufeld and Jacobs in Gallup's office, namely, by Jacobs that he would put in $12,500 cash, and by Neufeld, that he would put in $25,000 cash.   That such statements were made, is not only contradicted by Jacobs, but in part by the testimony given by Mrs. Marks herself, in her suit against the Chicago Furniture and Lumber Company, in

Michigan.   It was proved on the trial that in the Michigan case the following question was asked her, and she answered as follows:

Q.   " How was Mr. Neufeld to pay this money in, this $25,000 ? "

A.   " He was to pay it all in; this $25,000 was to be cash he talked about; that it was to be put in just as the business required it.   He said it would not be necessary to put it all in right away, but he was going to make a big showing in the bank, and he was always going to keep plenty of money in the bank."

After Mrs. Marks had been told by Neufeld that it would not be necessary to put in the whole amount of his subscription at once, that it was to be put in as the business required, she certainly could not have understood from the conversation in Gallup's office, even if such conversation occurred as she states, that Neufeld was to pay in the whole $25,000 at once.   Even though Gallup asked and Neufeld and Jacobs answered questions in Gallup's office, as the witness Marks states, it would not then follow that their subscriptions were to be paid at one time and in full.   To say that one is to put into a corporation $12,500 or $25,000 in cash, is not by any means to say that the amount is to be all paid at one and the same time.   But the statements of Neufeld and Jacobs, even if made as the witness Marks testifies and construed as she now construes them, were merely promissory, and not criminal pretenses, within the meaning of the law.   Such representations would not be sufficient even to sustain a civil action for fraud, the rule being that the representation must be of a present, material, existing fact, which the party making it knows, or has good reason to know, is false. People ex rel. v. Healy, 128 Ill. 9.

" A promise is not a pretense."   2 Bishop's New Criminal Law, Sec. 419, and cases cited in n. 2; 2 Archbold's Crim. Pr. and Pl., 465.

The articles of association were put in evidence by the prosecution, and show that the capital stock of the corporation, the Chicago Furniture & Lumber Company, was

People v. Jacobs.

$200,000, divided into 20,000 shares of the par value of $10 each, and that Dora Marks subscribed for 500 shares; and the evidence shows that Neufeld, Jacobs and Mrs. Marks signed the articles in Chicago, June 12, 1893.

The evidence shows, also, that Mrs. Marks can read, and that she did read some of the documents in evidence.  She acknowledged her signature to the articles of incorporation in Chicago, before Gallup, he acting as a notary, but it appears that he could not legally take an acknowledgment outside the county in which he lived in Michigan. Mrs. Marks testifies that, subsequently, on June 16, 1893, she was informed by Jacobs that they were ready to put their money in, and that she, Jacobs and Neufeld, met; she says :  "It was a $7,000 certificate, but I was to put in $5,000.   I signed it and I says :  ' Now where is your money? ' Mr. Neufeld took three papers out of his pocket, a white certificate, one that looked like mine, and two light blue papers, and he says : 'Here is our money,' and I gave Mr. Jacobs my certificate."

Jacobs testified that Mrs. Marks asked no such question as " Have you your money ready ? " and that he didn't see Neufeld hold out three papers, one white and two blue, or anything of that kind.

The State relies on the alleged statement of Neufeld and the production by him of the white and blue papers, as a false pretense, by reason of which the prosecuting witness was induced to part with her money.   Mrs. Marks could read, her evidence indicates that she is a woman of at least average intelligence and of average ability to understand and protect her own interests, and it seems incredible that she was induced to advance her money on the faith of pieces of paper which she did not examine, ask to look at, or even inquire what they contained.   It seems much more reasonable and probable that she advanced her money because of the obligations she had incurred.   She had concluded, as she herself admits, to join in the enterprise; had signed the contract of June 8, 1893, agreeing to form a corporation; had signed the articles of incorporation which recite a subscrip-

tion by her for 500 shares of stock of the par value of $10 each, and had thus become liable to the corporation to the extent of her subscription, and this, of itself, was a sufficient reason for her advancing the money.

In People v. Thomas, 3 Hill, 169, the indictment charged that Thomas, being the owner of a promissory note made by Jones, falsely pretended that the note had been burned or lost, by reason of which false pretense he obtained from Jones the amount of the note. The court say: "*Non constat* from the indictment that Jones sustained any damage by the false representation; nor that there was any intent on the part of Thomas, at the time of the representation, to work any damage. The note was due and payment was made. This was the only consequence—a thing which Jones was bound to do. A false representation by which a man may be cheated into his duty, is not within the statute."

The money advanced was due, not to Jacobs or Neufeld, of either of them, but to the company, and was obtained, not for them or either of them, but for the company, and the evidence shows that, by the request of Mrs. Marks, the $7,000 certificate of deposit was deposited in bank in Escanaba for collection, and when collected a certificate of deposit for $2,000 was returned to her, and the balance, viz., $5,000, was credited to the company.

The factory in Escanaba was operated by the new corporation for six months, until the prosecuting witness sued out a writ of attachment against the company in Michigan, thus temporarily suspending the business, and Jacobs, the plaintiff in error, who had resigned a situation in which he had been earning over $2,000 per annum, for the purpose of engaging in the enterprise, and who had advanced $1,000 to the new company, devoted his time and attention to the business of the company for six months, and received for his services only $800, which was all he ever received from the company.

We are clearly of opinion that the evidence does not sustain a conspiracy as charged in the indictment, and that if there was any concert of action between Jacobs and Neu-

feld, in reference to the prosecuting witness Marks, it was, to induce her to join them in a perfectly legitimate enterprise, and not to obtain her money, as charged.

The attorney for plaintiff in error having expressly waived all technical objections, we have considered the case solely on its merits.

The judgment will be reversed.